**SO ORDERED.**

**SIGNED this 03 day of April, 2008.**



                                                      **Dale L. Somers**
                                         **UNITED STATES BANKRUPTCY JUDGE**

_____

Opinion designated for on-line and print publication
IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

| In re: | |
|---|---|
| ERIC A. TOWNSEND, | CASE NO. 07-20956 |
| DEBTOR. | CHAPTER 13 |

**MEMORANDUM AND ORDER HOLDING FOR PURPOSES OF
CONFIRMATION UNDER § 1325(a)(*) THE COST OF FORCED-PLACED
INSURANCE IS INCLUDED IN A PURCHASE-MONEY CLAIM**

    The Court has under advisement the Debtor's objection to the claim of Wells Fargo Bank, N.A.[1] and Wells Fargo Bank N.A.'s objection to confirmation.[2] The primary issue presented by the objections is whether the claim of a secured creditor removed from cram down by the hanging sentence of 11 U.S.C. § 1325(a) may, in addition to the purchase price of the vehicle,

---

[1] Doc. 31.

[2] Doc. 10.

1

include a claim for the cost of force-placed insurance obtained by the creditor after the sales transaction. Debtor Eric A. Townsend (hereafter Debtor) appears by David A. Reed. Wells Fargo Bank, N.A. (hereafter Wells Fargo) appears by Jill D. Olsen and Michael P. Gaughan of South & Associates, P.C. There are no other appearances. The Court has jurisdiction.[3]

**FINDINGS OF FACT.**

The facts are not disputed. On April 25, 2006, Debtor purchased a 2004 Ford F-150 pickup truck (hereafter Vehicle) from Marcus Allen Broadway Ford, Inc., Kansas City, Missouri. Debtor executed a Retail Installment Contract and Security Agreement (hereafter Contract). The Contract was assigned to Wells Fargo, which had provided the financing. The Vehicle price was $23,843.09. After credit of $500 down payment and charges of $99.50 for documentation and $600 for GAP insurance, the total amount financed was $24,042.59. As to security, the Contract provided:

> SECURITY: To secure your payment and performance under the terms of this Contract, you give us a security interest in the Vehicle, all accessions, attachments, accessories, and equipment placed in or on the Vehicle, together called Property, and proceeds of the Property. You also assign to us and give us a security interest in proceeds and premium refunds of any insurance and service contracts purchased with this Contract.

The Contract required Debtor to have property insurance on the Vehicle in which the seller was named as loss payee, but did not require that such insurance be purchased as part of the transaction if Debtor had insurance acceptable to the seller. However, the Contract also provided

---

[3] This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and §§ 1334(a) and (b) and the Standing Order of the United States District Court for the District of Kansas that exercised authority conferred by § 157(a) to refer to the District's Bankruptcy judges all matters under the Bankruptcy Code and all proceedings arising under the Code or arising in or related to a case under the Code, effective July 10, 1984. An objection to a claim is a core proceeding which this Court may hear and determine as provided in 28 U.S.C.§ 157(b)(2)(K). There is no objection to venue or jurisdiction over the parties.

2

the seller could purchase insurance at Debtor's cost if evidence of insurance was not provided. It stated:

> COLLATERAL PROTECTION INSURANCE: Unless you provide evidence of the insurance coverage required by your agreement with us, we may purchase insurance at your expense to protect our interests in your collateral. This insurance may, but need not, protect your interests. The coverage that we purchase may not pay any claim that you make or any claim that is made against you in connection with the collateral. You may later cancel any insurance purchased by us, but only after providing evidence that you have obtained insurance as required by our agreement. If we purchase insurance for the collateral, you will be responsible for the costs of that insurance, including the insurance premium, interest and any other charges we may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to you total outstanding balance or obligation. The costs of the insurance may be more than the cost of insurance you may be able to obtain on your own.

Wells Fargo's lien in the truck was perfected pursuant to Missouri law.

In late 2006, Wells Fargo received notice that Debtor had allowed the insurance which was in place when the Vehicle was purchased to lapse. Wells Fargo purchased forced-placed insurance for the Vehicle from January 1, 2007 through April 30, 2007, for the total amount of $1,515.46, and this amount was added to the Debtor's loan balance.

Debtor filed for relief under Chapter 13 on May 8, 2007. Debtor's proposed plan listed Wells Fargo's secured claim as one to which § 506 would not apply, since it consists of a debt secured by a purchase-money security interest in a vehicle acquired for the personal use of the Debtor for which the debt was incurred within 910 days of filing the petition. Wells Fargo filed a proof of claim for $25,064.89 secured by the Vehicle. Debtor objected, asserting that the claim as filed included two elements which should be not be considered secured: (1) $600 for purchase

3

of GAP insurance, which Debtor contends is more properly an executory contract under § 365; and an unknown amount for post-transaction forced-placed insurance. Wells Fargo responded that it would obtain paperwork for Debtor to cancel the GAP insurance, and that portion of Debtor's objection is not before the Court.[4] Wells Fargo's response acknowledged that a portion of the claim consists of forced-placed insurance. The Court requested additional facts and invited briefs on the treatment of the portion of the claim for the cost of forced-placed insurance. Articulate and well reasoned briefs were filed. Oral arguments were heard on February 15, 2008.

**ANALYSIS AND CONCLUSION OF LAW.**

**A. Issue Presented and Positions of the Parties.**

One of the most problematical provisions of the Bankruptcy Abuse and Consumer Protection Act (BAPCPA) is the "hanging sentence" following § 1325(a)(9) (hereafter cited as 1325(a)(*)). For a claim coming within its terms, that sentence prevents cram down by bifurcation of the claim into a secured and unsecured portion based upon the value of the collateral and mandates that the Chapter 13 plan, as a condition for confirmation, pay the claim in full.[5] Subsection 1325(a)(*) provides:

> For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49)

---

[4] The Court will defer entering judgment on the claim objection until informed by the parties that all issues have been resolved.

[5] This Court has ruled that the creditor is entitled to interest at the *Till* rate. *In re Thomas*, Case no. 6-21363 (Bankr. D. Kan. Aug. 27, 2007).

4

acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.

In this case, Wells Fargo's claim has two components - the portion attributable to the purchase price of the Vehicle, and the portion attributable to the post-transaction purchase of forced-placed property insurance. Wells Fargo contends, under a transaction definition of purchase-money security interest, its entire claim, both of the components, comes within § 1325(a)(*), that the entire claim is secured by a purchase-money lien in the Vehicle, which was purchased by the Debtor for his personal use within 910 days before he filed for bankruptcy relief. As an alternative, Wells Fargo asserts that, if the second component is not secured by a purchase-money lien in the vehicle, it is secured by a purchase-money lien in other property of value.[6] Debtor, on the other hand, while agreeing that the portion of the claim attributable to the purchase price of the Vehicle is governed by § 1325(a)(*), contends that the portion of the claim attributable to the cost of forced-placed insurance is outside the subsection because it is not secured by a purchase-money lien in the Vehicle or other property of value.

**B. Definition of Purchase-Money Security Interest under the Missouri Article 9.**

Resolution of this dispute requires the Court to examine the meaning of the phrase "a purchase money security interest securing the debt that is the subject of the claim" as used in § 1325(a)(*). The Code does not define the term "purchase money security interest," but it is a term of art under Article 9 of the UCC. Since property interests for bankruptcy purposes are

---

[6] Because the Court rules in Wells Fargo's favor on the construction of purchase-money security interest, it does not address this alternative argument. However, it does note that under Missouri law, a purchase-money security interest may be granted only in goods or software, which may not include insurance contracts. Mo. Rev. Stat. §400.9-103(a)(1).

5

defined by state law,[7] to define purchase-money security interest bankruptcy courts generally defer to the law of secured transactions in the appropriate jurisdiction for guidance.[8] Here the sale occurred in Missouri, the security interest in the Vehicle was perfected in accord with Missouri law, and the Contract provides "that the law of Missouri will govern this transaction."[9]

The Court therefore starts its analysis by examining Article 9 of the Missouri Uniform Commercial Code, section 9-103, which defines purchase-money security interest.[10] It provides, in accord with the uniform version of revised Article 9, "a security interest in goods is a purchase-money security interest . . . to the extent that the goods are purchase-money collateral with respect to that security interest."[11] Purchase-money collateral is defined to mean "goods or software that secures a purchase-money obligation incurred with respect to that collateral."[12] The definition of purchase-money obligation has two parts. It means "an obligation of an obligor incurred as all or part of the price of the collateral"[13] (the seller/buyer purchase-money security interest) and also "value given to enable the debtor to acquire rights in or the use of the

---

[7] *Butner v. United States*, 440 U.S. 48, 55 (1979).

[8] *E.g., Billings v. Avco Colo. Indust. Bank (In re Billings)*, 838 F.2d 405 (10th Cir. 1988) (construing purcahse-money security interest as used in § 522(f)); *Citifinancial Auto v. Hernandez-Simpson*, 369 B.R. 36 (D. Kan. 2007) (construing purchase-money security interest as used in § 1325(a)(*)).

[9] Although the Missouri UCC excepts titled vehicles from at least some provisions of Article 9 (Mo. Rev. Stat. § 400.9-303), even as to motor vehicles the UCC definition of purchase-money security interest is "a useful guide" to Missouri's use of the term for purposes of § 1325(a)(*). *In re Weiser*, 381 B.R. 263, 266 (Bankr. W.D. Mo. 2007).

[10] Mo. Rev. Stat. § 400.9-103. The Missouri version of 9-103 is identical to uniform provision.

[11] Mo. Rev. Stat. § 400.9-103((b)(1).

[12] Mo. Rev. Stat § 400.9-103(a)(1).

[13] Mo. Rev. Stat. § 400.9-103(a)(2).

6

collateral if the value is in fact so used" (the buyer/financier purchase-money security interest).
There must be a "close nexus between the acquisition of collateral and the secured obligation."[14]
When the security agreement is between the seller and the buyer, that nexus is always present, assuming that all of the loan proceeds are used for the purchase of the collateral. When the security interest arises in the buyer/financier circumstance, that nexus will be present if the evidence shows funds were advanced to enable the purchase of the collateral and the funds were so used.

The term "price," used in the applicable definition of purchase-money obligation is not defined by revised Article 9. However, it is the subject of one of the official comments, which states: "As used in . . . the definition of 'purchase-money obligation,' the 'price' of collateral . . . includes obligations for expenses incurred in connection with acquiring rights in the collateral, sale taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations."[15] Hence, under the UCC the price includes not only the value paid for the collateral but also additional expenses relating to the collateral.

**C. Under the Missouri Article 9, Wells Fargo's Claim for the Cost of the Vehicle is Secured by a Purchase-Money Interest in the Vehicle.**

In this case, there is no dispute that Wells Fargo has a purchase-money security interest in the Vehicle. Debtor's obligation to the seller, Marcus Allen Ford, was a purchase-money obligation because it was incurred as the price of the Vehicle. The Vehicle is purchase-money collateral because it secures the Debtor's purchase-money obligation incurred in buying the

---

[14] Mo. Rev. Stat. § 400.9-103, Official UCC comment ¶ 3.

[15] *Id.*

Vehicle.  Wells Fargo therefore has a purchase-money security interest to the extent the Vehicle is purchase-money collateral with respect to the lien.

The question presented is the extent of the purchase-money collateral, which is determined by the amount of the purchase-money obligation.  There is no dispute that the purchase-money obligation includes the $23,843.09 cost of the Ford F-150, less the $500 cash down payment, plus the $99.50 documentation fee.  The Contract also shows a cost of $600 for Beacon GAP insurance, but the parties have not asked the Court to rule on whether this fee is included in the purchase-money obligation, and the Court expresses no opinion on this issue.  Rather, the dispute in this case is whether the cost of forced-placed insurance purchased after the sale is included in the purchase-money obligation and therefore secured by a purchase-money lien in the Vehicle.  Based upon the foregoing definition of purchase-money security interest, the Court holds that it is.

**D. Under Missouri Article 9, Wells Fargo's Claim for the Debt Incurred to Purchase Forced-Placed Insurance is Secured by a Purchase-Money Security Interest in the Vehicle.**

The Contract between Debtor and Marcus Allen Ford provides that the Vehicle shall secure "your payment and performance under this Contract."  Payment of the funds advanced for forced-placed insurance is an obligation of the Debtor under the Contract.  Therefore, pursuant to the agreement between Debtor and the seller, the cost of the insurance is secured by the Vehicle.  The question is whether this security interest, like the security interest securing the Vehicle sale cost, is a purchase-money interest.  The insurance obligation was not incurred at the time of the sale or for part of the purchase price of the Vehicle; it was incurred after the sale for the purchase of insurance.  Although this would seem to require its disqualification as a part of the purchase-money obligation, a closer examination of revised Article 9 refutes this simplistic approach.

8

Before the revision of Article 9, a commentator made the following persuasive argument that a purchase-money security interest should include the post-transaction costs incurred by the secured party to preserve the collateral.

> Assume creditor X has a perfected security interest in B's equipment and after-acquired equipment. Subsequently, equipment seller S sells a computer to B on time and retains an interest in the computer to secure the outstanding balance due on its price and any future amounts that S may spend to either preserve its value or to protect his interest in the computer. . . . Unfortunately, soon after S perfects his security interest, B fails to pay personal property taxes due on the computer, fails to make a required payments necessary to keep the computer insured against damage, and permits an artisan's lien to attach to the computer. To preserve the value of the computer as collateral, S pays these expenses. If B then defaults in his loan payments . . . , would S's purchase money priority in the computer cover these additional payments? Clearly, these post-sale payments cannot be considered part of the "price" of the computer. Although these payments are technically "add ons" to the price, the Code nonetheless permits their inclusion in the purchase money debt. . . .[16]

The rationale for inclusion of such expenditures in the purchase-money debt relied upon UCC 9-207 (UCC Rev 9- 207) which provides that when collateral is in the secured party's possession, reasonable expenses incurred in preservation of the collateral automatically becomes part of the debt secured by the collateral. Since such expenses automatically become part of the debt, they must also become part of the purchase-money debt. If this were not so, when a lender who has incurred preservation costs forecloses on purchase-money collateral, it would be necessary to bifurcate the claim into a purchase-money portion and a non-purchase-money portion. This would create cumbersome complexities and not promote the UCC's policy of protecting lenders

---

[16] McLaughlin, *"Add On" Clauses in Equipment Purchase Money Financing: Too Much of a Good Thing*, 49 Fordham L. Rev. 661, 673 (1981).

who finance the sale of goods to a buyer whose property is encumbered by a blanket perfected lien. Another commentator states as follows:

> Security agreements usually cover not only the principal amount of the loan or credit sale, but also ancillary obligations such as interest, time-price differential, default charges, installation charges, cost of insurance not obtained by the debtor, collection costs, attorney fees, and the like. Although there are no good cases on point, the language of old UCC § 9-107 should be read to include within the definition of "purchase money security interest" any obligations that are ancillary to the principal obligation.[17]

Revised Article 9, by including the definition of price in the official UCC Comment, is consistent with the foregoing analysis. It is expansive in the types of expenses included. There is no express limitation requiring that the items in addition to the purchase price be incurred at the time of acquisition of the collateral, and only some of the items listed would fit into this time frame. Finance charges, interest, expenses of collection and enforcement, and attorney's fees, although included in the liabilities of the purchaser in the sales contract, would not actually be incurred until after the sale. Although forced-placed insurance is not enumerated in the comment, it is similar to the obligations enumerated. It is provided for in the purchase contract and is closely related to the collateral, just as are freight charges and storage charges. To construe the definition of purchase-money security interest as excluding the cost of forced-placed insurance purchased by the secured party to fulfil the debtor's contractual obligation to insure the collateral would make purchase-money secured transactions cumbersome. In the situations where there are both a purchase-money lien and a competing lien, the lien priority determination would become complex, requiring division of the purchase-money lien holder's

---

[17] 1 Clark & Clark, *The Law of Secured Transactions under the Uniform Commercial Code* ¶ 3.09[2][d](rev. ed 2008).

10

claim into two components, perhaps of different priority.  Inclusion of the costs of preservation of collateral in purchase-money debt furthers the UCC policy of encouraging financed sales, even when others may have a blanket lien on assets, including after acquired property.

The Court therefore finds that under the uniform definition of purchase-money security interest in revised Article 9, the cost of forced-placed insurance is included in the purchase-money obligation for the purpose of the definition of a purchase-money security interest, when the insurance was purchased by a secured party because the purchaser breached a contractual duty to insure the property and, upon such breach, the agreement allowed the seller to purchase the insurance at debtor's cost.  When so holding, however, the Court does not adopt the broad transaction centered construction of purchase-money security interest urged by Wells Fargo.  There may be costs, other than forced-placed insurance, associated with the purchase of a vehicle satisfying the § 1325(a)(*) criteria which would not qualify as part of the purchase-money obligation.

**E. The Article 9 Definition of Purchase-Money Security Interest Controls the Construction of § 1325(a)(*).**

The Code does not expressly adopt the state law definition of purchase-money security interest.  The official comment to the Missouri UCC definition of purchase-money security interest states:

> . . . Whether a security interest is a "purchase-money security interest" under other law is determined by that law.  For example, decisions under Bankruptcy Code Section 522(f) have applied both the dual-status and the transformation rules.  The Bankruptcy Code does not expressly adopt the state law definition of "purchase-money security interest."  Where federal law does not

11

defer to this Article, this Article does not, and could not, determine a question of federal law.[18]

However, as stated by the Unites States Supreme Court, "Congress has 'left the determination of property rights in the assets of a bankrupt's estate to state law,' since such '[p]roperty interests are created and defined by state law.'"[19] The justification for application of state law is not limited to ownership interests, but also applies to security interests.[20] It has long been the law that the "validity, nature and effect of a lien on the property of a bankrupt" are governed by state law, except as controlled by express provisions of the Code.[21] For purposes of lien avoidance pursuant to § 522(f), the "courts have uniformly looked to the law of the state in which the security interest is created" for the definition of purchase-money security interest.[22]

The Court finds no reason to deviate from this rule when construing purchase-money security interest as used in § 1325(a)(*). The United State Supreme Court has stated:

> Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceedings. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage

---

[18] Mo. Rev. Stat. §400.9-103, Official UCC comment ¶8.

[19] *Nobelman v. Amer. Savings Bank*, 508 U.S. 324, 329 (1993) citing *Butner v. United States*, 440 U.S. at 54-55.

[20] *Id.*

[21] *Porter v. Searle*, 228 F.2d 748, 750 (10th Cir. 1955); see also *Butner v. United States*, 440 U.S. at 54, n. 9 (stating, "[S]tate laws are thus suspended only to the extent of actual conflict with the system provided by the Bankruptcy Act of Congress.").

[22] *In re Billings*, 838 F.2d at 406. *See e.g., Pristas v. Landaus of Plymouth, Inc.(In re Pristas)*, 742 F.2d 797, 800 (3rd Cir. 1984) (when considering lien avoidance under § 522(f), holding that the Pennsylvania definition of purchase-money security interest applied and that the price included not only costs of goods but also finance charges and sales taxes).

12

> forum shopping, and to prevent a party from receiving a "windfall merely by reason of the happenstance of bankruptcy. . . ."[23]

For purposes of § 1325(a)(*), this Court finds no federal interest requiring a result different from the Missouri UCC. There is no express language in § 1325(a)(*) adopting a definition different from Article 9. There is nothing in the history of the hanging sentence identifying a federal interest requiring a federal definition of purchase-money security interest or suggesting that Congress intended that Article 9 should not be followed when defining purchase-money security interest. Further, hostility to the purpose to be accomplished by the hanging sentence or to perceived unfairness in requiring Debtors to pay the claim in full when collateral has depreciated does not qualify as basis to reject state law. Although the Court agrees with Debtor that § 1325(a)(*) should be narrowly construed to create a limited exception to the usual treatment of secured claims in Chapter 13 plans, a rule of narrow construction is not sufficient to reject the long standing rule that property interests, including liens, are determined by state law or to reject the construction of the UCC definition of purchase-money obligation applicable in other circumstances. Incorporation of the Article 9 definition of purchase-money security interest in § 1325(a)(*), as well as other bankruptcy Code sections, reduces uncertainty and promotes simplicity and uniformity in commercial and consumer transactions, one of the purposes of the UCC.[24] Many courts construing § 1325(a)(*) have adopted the Article 9 definition of purchase-money security interest.[25] The Missouri Bankruptcy Court, after noting

---

[23] *Butner v. United States*, 440 U.S. at 55.

[24] *See* Mo. Rev. Stat § 400.1-102.

[25] *E.g., In re Sanders*, 377 B.R. 836, 846 (Bankr. W.D. Tex. 2007) (for purposes of § 1325(a)(*), holding that negative equity is not included in purchase-money security interest in vehicle)(citations omitted). *In re Vega*, 344 B.R. 616 (Bankr. D. Kan. 2006) (applying Kansas UCC and holding that

13

that bankruptcy courts look to state law and that Missouri does not apply the UCC to motor vehicle liens, when construing § 1325(a)(*) found the "definition in . . . [Mo. Rev. Stat. Ann. § 400.9.103] a useful guide to Missouri's use of the term 'purchase money security interest.'"[26]

The Court has considered two § 1325(a)(*) cases cited by the parties where, as this Court reads the opinions, the Article 9 definition of purchase-money security interest was not followed. The first is Judge Lundin's decision in *Hayes*,[27] which appears to adopt a federal definition of purchase-money security interest specifically for § 1325(a)(*). In *Hayes*, under facts similar to this case, Judge Lundin held that the cost of GAP insurance[28] was not secured by a purchase-money lien in a vehicle. He construed § 1325(a)(*) as collateral based, with different rules for debts secured by purchase-money security interests in motor vehicles and in any other thing of value. As to the claim for GAP insurance, the creditors took the position that they had a purchase-money security interest in the vehicles based on the contracts and applicable state law. The court rejected this position as a matter of federal law, based upon the

---

negative equity financing is not secured by a purchase-money lien in vehicle); *Citifinancial Auto v. Hernandez-Simpson*, 369 B.R. at 45 (applying Kansas UCC and holding that negative equity financing is not secured by a purchase-money lien in vehicle); *In re Erickson*, 2006 WL 4846379 (Bankr. D. Utah 2006) (applying Utah UCC and holding that purchase-money security interest included costs of taxes, document preparation fee, and credit report but excluded cost of insurance purchased at the time of the sale).

[26] *In re Weiser*, 381 B.R. at 266 (construing purchase-money security interest for purposes of § 1325(a)(*) to include the purchase cost of a vehicle, the cost of GAP insurance, and the financing of negative equity on the vehicle traded as part of the purchase transaction).

[27] *In re Hayes*, 376 B.R. 655 (Bankr. M.D. Tenn. 2007).

[28] GAP insurance is used when a borrower purchasing an automobile finances more than the vehicle is worth. The insurance covers the difference between the car's value and what is owed to the lien holder. If the car is totaled in an accident, for example, and the collision insurance pays only the value of the car, the GAP insurance covers the difference between the value and the secured debt, so there is no unsecured deficiency. *In re Weiser*, 381 B.R. at 265, n.1.

14

collateral specific language of § 1325(a)(*). Judge Lundin held that "[s]tate commercial law with respect to purchase money security interests cannot trump the collateral-based distinction in the hanging sentence."[29] Because the purchase contracts purported to give the vehicle seller a purchase-money security interest in the insurance policies, proceeds, and premium rebates, Judge Lundin did not permit creditors to disclaim that interest and assert their alleged purchase-money liens were in the vehicle.[30] This Court respectfully rejects Judge Lundin's approach. The opinion does not articulate why the Article 9 definition was found deficient or why courts should not follow the usual rule of incorporation of the UCC definition where a term of art relating to secured transactions is used in the Code.

The second opinion is the decision of Judge Berger, a member of this Court, in *Smith*,[31] where for purposes of § 1325(a)(*) he adopted a narrow interpretation of purchase-money security interest. Under this construction as a matter of law, and without consideration of the details of a purchase-money obligation under Article 9, all amounts other than the purchase price incidental to the costs of a credit transaction, such as collection costs, service contracts, and insurance are not included in a purchase-money security interest. Using this narrow definition, Judge Berger held that forced-placed insurance was not part of the purchase-money obligation, that creditor's claim should be bifurcated into two components, one for the collateral's price, and one for the additional debt associated with the transaction. Only the first

---

[29] *In re Hayes*, 376 B.R. at 666.

[30] *Id.*, 376 B.R. at 667. As an alternative rationale, Judge Lundin held the Article 9 definition of purchase-money security interest not satisfied because the creditors had failed to show a sufficiently close nexus between the extension of credit and the Debtors' purchase of the vehicles, primarily because the insurance was not required as a condition of the sale transaction. *In re Hayes*, 376 B.R. at 671.

[31] *In re Smith*, Case no. 06-20508 (Bankr. D. Kan. Nov. 6, 2006).

15

component was held to be governed by § 1325(a)(*). No explanation was provided why the Article 9 definition was not adopted. For the reasons stated above, the Court respectfully rejects both of these positions, finding that adoption of the Article 9 definition is more appropriate when construing § 1325(a)(*).

**F. Wells Fargo's Claim Secured by a Purchase-Money Security Interest in the Vehicle Includes the Cost of Forced-Placed Insurance.**

For the foregoing reasons, the Court holds that the Wells Fargo's claim for forced-placed insurance is included in its claim secured by a purchase-money security interest in the Vehicle for purposes of § 1325(a)(*). Debtor's objection to the claim of Wells Fargo based upon inclusion of the cost of forced-placed insurance in its purchase-money claim is overruled and Wells Fargo's objection to confirmation based upon Debtor's failure to include the cost of forced-placed insurance in the § 1325(a)(*) claim is sustained.

The foregoing constitute Findings of Fact and Conclusions of Law under Rules 7052 and 9014(c) of the Federal Rules of Bankruptcy Procedure which make Rule 52(a) of the Federal Rules of Civil Procedure applicable to this matter. Both Wells Fargo's objection to confirmation and Debtor's objection to the claim of Wells Fargo include additional issues not addressed by this opinion. The Court anticipates that the parties will resolve these issues by agreement and requests that they inform the Court of their agreement so judgments disposing of all issues can be prepared. Upon being so informed, judgments based upon this ruling will be entered on separate documents as required by Federal Rule of Bankruptcy Procedure 9021 and Federal Rule of Civil Procedure 58.

**IT IS SO ORDERED.**

###